AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| JAIME TRAN, | Case No. 2:23-mj-00778-DUTY |
| Defendant | |

FILED
CLERK, U.S. DISTRICT COURT
2/17/23
CENTRAL DISTRICT OF CALIFORNIA
BY: eb   DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
2/17/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: CD   DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of February 15, 2023, and February 16, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 249(a)(1), (B)(ii) | Hate Crime Acts |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Cody Bescript
Complainant's signature

Cody Bescript, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 2/17/23

Judge's signature

City and state: Los Angeles, California

Hon. Margo A. Rocconi, U.S. Magistrate Judge
Printed name and title

AUSA: Kathrynne Seiden

**AFFIDAVIT**

I, Cody Bescript, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Jaime Tran ("TRAN") for violations of 18 U.S.C. § 249(a)(1), (B)(ii): Hate Crimes.

2. This affidavit is also made in support of an application for a warrant to search a 2012 gray four-door Honda Civic (the "SUBJECT VEHICLE"), as described more fully in Attachment A, for evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 249(a)(1) (Hate Crimes); 245(b) (Interference With Federally Protected Activities); and 924(h) (Receipt of a Firearm for Use in a Felony) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.   I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since August 2020.  I am currently assigned to a civil rights squad where I investigate hate crimes, conspiracies, civil rights violations, and deprivation of rights under color of law.  I received 21 weeks of formal training at the FBI Academy in Quantico, Virginia.  After graduating from the FBI Academy, I rotated through several different squads to gain experience about various types of investigations conducted by the FBI, including investigations relating to public corruption, terroristic threats, money laundering, and counterintelligence, as well as hate crimes and civil rights violations.

5.   As an FBI Special Agent, I am familiar with and have used numerous investigative techniques, including but not limited to search warrants, physical surveillance and counter-surveillance, court-authorized interception of wire, oral, and electronic communication, working with confidential sources, cooperating with victims and witnesses, and compiling database information.  Through my training, experience, and conversations with other law enforcement officers and agencies, I am familiar with the motivations of, and methods employed by, individuals who commit hate crimes and other civil rights violations.

## III. SUMMARY OF PROBABLE CAUSE

6.   On February 15, 2023, TRAN intentionally shot Victim-1 at close range as Victim-1 was leaving religious services at a synagogue in Los Angeles, California.  Victim-1 was dressed in a

manner that visibly identified his Jewish faith, specifically, a black jacket and a head covering.  Victim-1 survived, but sustained a gunshot wound to the lower back.

7.   On February 16, 2023, TRAN intentionally shot Victim-2 at close range as Victim-2 was leaving religious services at another synagogue, just one block from where TRAN shot Victim-1 the day before.  Like Victim-1, Victim-2 was dressed in clothing that visibly identified his Jewish faith, again a black jacket and a head covering.  Victim-2 survived, but sustained a gunshot wound to the bicep.

8.   Later on February 16, 2023, TRAN was arrested after he discharged an AK-style firearm near the SUBJECT VEHICLE.

9.   In a Mirandized, recorded interview, TRAN acknowledged having intentionally shot the two victims.  TRAN told agents that he searched for a "kosher" market on the social media application, Yelp.  I know from my training and experience that kosher foods are foods that conform to the Jewish dietary regulations.  After locating a kosher market, TRAN drove to the market.  TRAN said he had selected his victims because of their "head gear."

10.  TRAN has a history of antisemitic and threatening conduct.  For example, in December 2022, TRAN emailed dozens of his former classmates, describing Jewish people as "primitive" and encouraging his classmates to blame any "inconvenience" or lost revenue from the COVID-19 lockdowns on the "Iranian Jew." Between August and November of 2022, TRAN repeatedly texted a former classmate antisemitic and threatening messages,

3

including: "Someone is going to kill you, Jew" and "I want you dead, Jew."

## IV. STATEMENT OF PROBABLE CAUSE

11. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. TRAN Shoots Victim-1 as Victim-1 Leaves Religious Services at a Synagogue

12. According to an interview of Victim-1 by the Los Angeles Police Department ("LAPD"), at approximately 9:45 a.m. on February 15, 2023, Victim-1 left religious services at a synagogue near the 1400 block of Shenandoah Street in the Pico-Robertson neighborhood of Los Angeles. Victim-1 was wearing a black jacket and a black head covering. Victim-1 walked toward his car, which was parked approximately one block away from the synagogue. As Victim-1 approached the passenger side of his car, he observed a 1980s to 1990s gray Honda Civic, later identified as the SUBJECT VEHICLE, drive up behind the driver's side of his car and stop approximately one car length behind it. Victim-1 walked around his car to the driver's side and observed the Honda move slowly towards him. As Victim-1 opened his front driver side door and turned his back to the Honda, he heard a loud bang and felt sudden pain on the right side of his back. Victim-1 saw the Honda drive away south on Shenandoah Street and realized he had been shot.

13. LAPD Officer Cervantes interviewed witness B.C. on February 15, 2023, who stated that he heard two gunshots at

approximately 9:45 a.m.  B.C. saw a gray or beige Honda Civic speed south on Shenandoah Street.  B.C. exited his apartment building and approached the victim, whom B.C. stayed with until police arrived.

14.  LAPD Officer Perez interviewed witness H.R. on February 15, 2023, who relayed that she and her husband were walking on Shenandoah Street between 9:30 a.m. and 10:00 a.m. when they saw an Asian male in his late 30s driving a gray sedan slowly on Shenandoah street with all the car windows rolled down.  H.R. described the man as wearing a black beanie and a dark sweater, with a mustache or a goatee, and guessed that the car was a 1990s to 2000s-era Toyota or Honda.  H.R. had earlier noticed the car driving slowly around the neighborhood several times.

15.  On February 15, 2023, LAPD Officer Casey interviewed witness S.P., who heard two gunshots at approximately 9:35 a.m.  S.P. looked out her apartment window and saw a gray sedan driving southbound on Shenandoah Street.

**B.   TRAN Shoots Victim-2 as Victim-2 Leaves Religious Services at a Synagogue**

16.  According to Victim-2, who was interviewed by the LAPD after the shooting, at approximately 8:00 a.m. on February 16, 2023, Victim-2 was leaving religious services at a synagogue near the 1600 block of South Bedford Street, in the Pico-Robertson neighborhood of Los Angeles, approximately one block away from where Victim-1 was shot the previous day.  Like

Victim-1, Victim-2 was dressed in a black jacket and a head covering.

17. Victim-2 approached the intersection of South Bedford Street and Pickford Street. While he was waiting to cross the street, Victim-2 saw a dark colored sedan drive eastbound on Pickford Street and stop beyond the limit line on Bedford Street. Victim-2 made eye contact with the driver, whose window was rolled down. As Victim-2 began to walk behind the sedan, he heard three loud shots. Victim-2 observed the sedan turn southbound on Bedford and speed away. Victim-2 then realized that his right arm was bleeding and that he had been shot.

18. Victim-2 only brief saw the suspect, whom he described as male, white, approximately 30 to 35 years old, wearing a black hooded sweatshirt, a black surgical mask, and black glasses.

### C. LAPD Identifies TRAN as the Shooter and the Owner of the SUBJECT VEHICLE

19. LAPD Officers Goforth and Silas reviewed video footage from a camera at 1600 Bedford Street that faces the intersection where the second shooting occurred. The officers saw the SUBJECT VEHICLE approach the intersection of Bedford Street and Pickford Street and roll through the stop sign as the victim attempted to cross the street. After the shooting occurred, the video footage captured a male subject driving a vehicle that appeared to be the SUBJECT VEHICLE onto Bedford Street and then speeding away. The car appeared to be an older model gray Honda Civic.

20. LAPD Officer Prescott responded to assist with the investigation. While responding, she saw a male Asian in his 30s, wearing a surgical mask and a black hoodie, driving a dark gray Honda Civic. Officer Prescott took a photograph of the car. Officer Prescott then reviewed the footage of the incident and recognized the driver of the Honda to be the man she had seen in the area and the vehicle to match the photograph of the car she took, which displayed the license plate of the Honda.

21. Based on law enforcement databases, LAPD determined that the Honda (the SUBJECT VEHICLE) is registered to TRAN. TRAN's DMV photo was also consistent with the witnesses' description of the shooter.

22. License plate reader records also placed TRAN's Honda (the SUBJECT VEHICLE) in the area of the two shootings at the times they occurred.

D. **TRAN Fires an AK-Style Weapon in Cathedral City, California**

23. LAPD identified a mobile telephone number associated with TRAN. Based on location data from TRAN's phone from the afternoon of February 16, 2023, LAPD determined that TRAN was in the Palm Springs area.

24. On February 16, 2023, at approximately 5:45 p.m., the Cathedral City Police Department ("CCPD") received a call about a man with a gun in the area of Cathedral City. The calling party reported hearing a shot fired and seeing a man with a firearm near a Honda Civic. As relayed to federal agents by the responding officers, upon arrival, CCPD located TRAN standing

7

next to the driver side door of the subject vehicle.  On approaching the car, the officers saw in plain view on the driver side front seat an AK-style rifle and a .380-caliber handgun, consistent with the firearm believed to have been used in the shootings, based on shell casings left at the scene.  Officers also found a spent casing consistent with having been discharged from an AK-style rifle.

25.   CCPD arrested TRAN and took the SUBJECT VEHICLE into custody.  A cellular telephone was not found on TRAN'S person.  CCPD impounded the SUBJECT VEHICLE but did not search the VEHICLE.  Because the phone provided locational information near where TRAN was arrested but was not recovered from TRAN's person, I believe TRAN's phone is likely located in the SUBJECT VEHICLE.

      E.    **In a <u>Mirandized</u>, Recorded Interview, TRAN Confesses to Shooting Two Jewish Victims Based on Their Proximity to a Kosher Market and Their "Head Gear"**

26.   Based on my conversations with law enforcement officers who were present during TRAN's interview, I am aware that after his arrest, TRAN was advised of his Miranda rights and waived them, and in a recorded interview with LAPD and FBI agents, TRAN admitted that he was responsible for shooting someone in the Los Angeles area earlier in the day.  TRAN stated that he had looked up a "kosher market" on Yelp and decided to shoot someone in the area of the market.  TRAN also acknowledged that he shot another victim in the Los Angeles area the previous day.

8

27. TRAN said he knew the victims he shot were Jewish because of their "head gear." Based on my training and experience, and my knowledge of the investigation, I believe his reference to "head gear" was a reference to a type of Jewish head covering. TRAN asked whether the victims had died.

28. TRAN said he was homeless and had been living out of the SUBJECT VEHICLE for the last 12 to 14 months. TRAN stated that he obtained the firearms from someone he did not know in Arizona.

**F.   TRAN Has a History of Making Antisemitic Comments and Threats**

29. Based on my review of emails, text messages, and reports, I am aware of the following:

    1.   <u>TRAN Sent Antisemitic and Threatening Text Messages to a Former Classmate Throughout 2022</u>

30. Between August 2022 and November 2022, TRAN repeatedly called and texted M.N.H., who is Jewish and who was a classmate of TRAN's at a dental school TRAN was attending at one time. TRAN sent M.N.H. numerous threatening and antisemitic voicemails and text messages. According to M.N.H., TRAN was expelled in 2018. M.N.H. believed it was TRAN calling him because he recognized TRAN's voice and because TRAN had made similar antisemitic remarks prior to being expelled. TRAN sent the following text messages to M.N.H.'s cellular telephone in 2022:

    a.   "Fucking Jew. Piece of shit Jew. FUCK YOU JEW. JEWBAG JEWBAGEL JEW."

    b.   "FUCK YOU PIECE OF LITERAL FUCKING SHIT JEW. YOU FUCKING DIPSHIT. I HATE YOU LIKE FUCKING CRAZY YOU FUCKING

STUPID PATHETIC LOSER SUBHUMAN TRASH UGLY DISGUSTING WORTHLESS SENSELESS JEW."

    c.   "Someone is going to kill you, Jew.  Someone is going to kill you, Jew.  Someone is going to kill you, Jew.  Someone is going to kill you, Jew."

    d.   "Fuck you Jew."

    e.   "FUCK YOU JEW.  Just kill yourself tonight you fucking Jew.  I want you dead, Jew.  Someone is going to kill you, Jew."

    f.   "Kill yourself you Jew."

    g.   "Cut your dick off and bleed to death you fucking Jew."

    h.   "Fuck you, you fucking retarded faggot Jew."

    i.   "FUCKING JEW."

    j.   "Fucking bitch Jew.  Your mom is a slutty whore, your sister is a man, and your dad sucks dick for a living.  Burn in an oven chamber you bitch Jew."  TRAN then included a photograph of a gas chamber.

    2.   <u>TRAN Sent an Antisemitic Email to Classmates in or Around November 2022</u>

    31.  On or around November 25, 2022, TRAN emailed dozens of former classmates at the same dental school.  TRAN wrote: "That Persian/Iranian Jew of the Class of 2020 made up a fake, bs disease (COVID) and based it on the anesthesia incident that I had with [J.M.] and [J.S.]."  TRAN included a photograph of a flier reading "EVERY SINGLE ASPECT OF THE COVID AGENDA IS

10

JEWISH." The flier listed various government officials and the word "JEWISH" written next to the name of every official.

### 3. TRAN Sent Antisemitic Email to Classmates In or Around December 2022

32. In or around December 2022, TRAN again emailed dozens of his former classmates. TRAN titled the email: "IMPORTANT Announcement to . . . [the] School of Dentistry." In it, TRAN told his classmates: "If you were ever inconvenienced and/or denied entry because of the masking policy or the proof of vaccination policy, you should be upset at the Iranian Jew. If you, or a loved one's business lost revenue by the lockdowns, you should be upset at the Iranian Jew."

33. TRAN included a screen shot from a website defining a "Persian Jew." The screen shot noted that "Persian Jew[s]. . . can be found in tiny apartments in Westwood and Beverly Hills"[1] and described them as "primitive," "narrow minded," and as having "thick skulls." The screen shot further noted that "Persian Jews. . .scrap nickels and dimes," "never donate to any charities," and have "no respect towards people of other backgrounds." The description noted that "Persian Jews'. . .men look like women and their women resemble to men. Short, thick, dark, and ugly."

34. TRAN concluded the email: "Going forward, I hope you all spread the word to your loved ones about the origins of COVID. I tagged the Iranian Jew, such as [M.N.H.], and his associates in this email so you could ask them about it. I also

---

[1] The shootings occurred near the Westwood/Beverly Hills area of Los Angeles.

11

hope they quit putting tabs on me to the Jewish community and creeping on all of my socials."

## V. TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES

35. Based on my training and experience, I know that individuals who commit bias-motivated offenses or who conspire with others to commit crimes based on shared bias or ideology often have in their homes, vehicles, or on their person books, personal journals, paraphernalia, photographs, papers, clothing, wall coverings, documents (electronic or otherwise), and other items that contain evidence of bias, such as animus towards people based on religion or national origin.

36. Based on my training and experience, I know that individuals who commit bias-motivated offenses or who conspire with others to commit crimes based on shared bias or ideology use cell phones, other electronic devices, e-mail, and social media to research and conduct their illegal activities, to preserve and distribute photographs and videos in order to memorialize previous illegal activity and advance their social and ideological agenda, and to maintain contact with other confederates, conspirators, and criminal associates involved with the planning, targeting, and execution of their goals. These goals can include, espousing violence, making threats online, recruiting like-minded individuals to their activities, and committing acts of violence that target individuals who are seen as anathema to their shared ideology or social agenda. Indeed, the crimes and related social and ideological activities

described in this affidavit were organized in part using the social media platform Instagram and using personal cell phones.

37. Based on my training and experience, I know that individuals are likely to have digital devices in their home, in their vehicle, and on their person. For instance, if an individual is not home at the time of a search, it is likely that digital devices, such as a cell phone, will be found on the individual's person or in their car if they are driving.

38. In addition, I know through my training and experience that individuals who commit bias-motivated offenses or who conspire with others to commit crimes based on shared bias or ideology use various symbols, slogans, and paraphernalia that they often maintain in their homes, vehicles, and on their person. They can distribute these symbols, slogans, and paraphernalia in the public square, post online, or wear them in the form of clothing or jewelry. Such individuals will also use banners, flags, and posters to publicly advertise their social and ideological goals and/or to use as a recruitment tool. Evidence of these items is often maintained in the individuals' homes, in their vehicles, on their person, and/or on their digital devices.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

39. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

13

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the

14

unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

    d. Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

40. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

16

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

41. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

42. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

17

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TRAN's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of TRAN's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

43. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII. CONCLUSION

44. For all of the reasons described above, there is probable cause to believe that TRAN has committed violations of 18 U.S.C. § 249(a)(1), (B)(ii): Hate Crimes. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the vehicle described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __17th__ day of February, 2023.

_____
THE HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE